UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CURLEY RICHARD,<br>        *Plaintiff,*<br>                *v.*<br>TOWN OF GREENWICH,<br>        *Defendant.* | Civil No. 3:10cv225 (JBA)<br><br>December 7, 2015 |

**RULING ON MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiff Curley Richard brought this suit against the Town of Greenwich ("the Town"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 (Count I); the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (Count II); 42 U.S.C. § 1981 (Count III)[1]; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. Ann. § 46a-60 (2015) (Count IV). Mr. Richard's claims arose out of the Town's appointment of another candidate, Dwayne Lockwood, to a Town position for which Mr. Richard had applied. Mr. Richard alleges unlawful discrimination on the basis of race and color (Counts I and IV) and unlawful discrimination on the basis of age (Counts II and IV).

A jury trial was held from February 27, 2015 until March 9, 2015. On March 6, 2015, Defendant brought an oral motion for judgment as a matter of law [Doc. # 69], which was denied without prejudice [Doc. # 70]. On March 9, 2015, the jury returned a verdict [Doc. # 78] for Defendant on the age discrimination claim under the ADEA (Count II), but was unable to reach a verdict on the race discrimination claims (Counts I

---

[1] Plaintiff withdrew his § 1981 claim before trial, as recognized by the Court in its February 9, 2015 Order [Doc. # 61] on Pre-Trial Motions.

and IV) and the age discrimination claim under the CFEPA (Count IV). Defendant renewed its motion [Doc. # 81] for judgment as a matter of law on April 2, 2015. For the following reasons, Defendant's motion is granted.

## I.      Background

### A.  The Process Control Manager Position

On September 26, 2008, the Town published an advertisement announcing an "open competitive examination for the position" of Process Control Manager ("the Position") in the Sewer Department of the Town's Department of Public Works. (Job Description, Joint Trial Ex. A at 2.) The Process Control Manager is responsible for operating the Grass Island Wastewater Treatment Plant ("the Plant"). Specifically, the Manager must "manage the staff that operates the [P]lant"; and "interact[] with Wastewater Division Manager on projects" relating to the Plant. (Def.'s Trial Ex. 521.)

In addition, the Process Control Manager is responsible for ensuring that the Plant "meets its permit limits contained in the permit issued by the State of Connecticut." (*Id.*) Commissioner of Public Works Amy Siebert explained at trial that "[w]astewater treatment plants operate under permits." (Siebert Test. Feb. 27, 2015, Ex. 1 to Def.'s Renewal Mot. for J. [Doc. # 81-2] at 56.)[2] Under the system, every plant receives a permit which requires the plant to remove a certain amount of nitrogen from its waste stream. Every plant has to meet its permit "requirements to be able to have . . . wastewater go out of the plant, into the final discharge point, and be acceptable to the regulatory committee

---

[2] The page numbers used with respect to trial testimony refer to the numbers used by the court reporter (in the right margin), not to the numbers at the bottom of each page.

. . . .” (*Id.*) If a plant does not “meet [its] permit, [it] can be subject to fines [and/or] orders from regulatory agencies.” (*Id.*) On the other hand, as Wastewater Division Manager Richard Feminella testified, if a plant removes more nitrogen than required by its permit, it receives money back from the state.

## B. The Application Process

The Town received four applications for the Position, including one from Plaintiff Curley Richard and one from Dwayne Lockwood. At the time of his application, Mr. Richard, an African-American man, was sixty-three years old. He had worked in the wastewater treatment field for over thirty years, including serving as plant Superintendent for the Metropolitan District Commission for thirteen years. (Richard Appl., Joint Trial Ex. B at 3.)

Mr. Lockwood, a Caucasian man, was forty-seven years old when he applied for the Position. He was the only internal candidate. As of December 2008, Mr. Lockwood had worked for the Town in the Department of Public Works for more than twenty years and had been Interim Process Control Manager at the Plant since January 2008. (Lockwood Appl., Joint Trial Ex. C at 3.)

The Town directed all four of the applications it received to the Department of Human Resources (“HR”) for a basic minimal qualifications assessment. Minimum qualifications for the Position were:

1. Bachelor’s Degree from an accredited college or university in Environmental or Civil Engineering or a closely related field plus 5 years of experience in environmental engineering, including 2 years of administrative experience.
2. Education and experience equivalent to #1 above.

3

(Job Description at 2.)

After assigning each candidate a score based on the information contained in his/her application, HR determined that three of the four candidates possessed the minimum qualifications for the Position: Mr. Richard, Mr. Lockwood, and Mr. C. (*See* Eligibility List, Joint Trial Ex. M; Iannucilli Memo, Def.'s Trial Ex. 505.) Although neither Mr. Richard nor Mr. Lockwood possessed a Bachelor's degree in Environmental or Civil Engineering or a closely related field, HR determined that each had attained an equivalent combination of education and experience. Based on its initial review, HR assigned Mr. Richard a total score of 83%; Mr. Lockwood and Mr. C each received scores of 70%. (Eligibility List.) The applications were then referred to Amy Siebert.

Ms. Siebert convened a three-person interview panel consisting of herself, Mr. Feminella, and Executive Director of the Stamford Water Pollution Control Authority Jeanette Brown. After interviewing each of the three candidates, the panel selected Mr. Lockwood for the Position on the basis of his intimate familiarity with the Plant and his solid interview performance. (Siebert Test. Feb. 27, 2015 at 49–56.)

Ms. Siebert explained at trial that Mr. Lockwood's extensive experience at the Plant gave him "an excellent handle on how to operate the plant, which is . . . the critical element" to meeting the Plant's permit, and Mr. Lockwood performed better at his interview than any of the other candidates. (*Id.* at 48, 49–50.) Ms. Siebert did observe in her interview notes, however, that Mr. Lockwood exhibited some weaknesses, specifically with respect to "process," "maintenance," and capital improvement planning. (Siebert Notes re Lockwood, Joint Trial Ex. J at 1.) Both Ms. Siebert and Ms. Brown noted that Mr. Richard lacked "presentation skills," "mumbled," was "not a great" or "clear" speaker,

4

lacked "good eye contact," and was weak in "process." (Siebert Notes re Richard, Joint Trial Ex. G at 1; Siebert Test. Feb. 27, 2015 at 83.)

### C.  The Lawsuit

On January 29, 2009, after learning of the Town's decision to hire Mr. Lockwood over him, Mr. Richard filed a charge of employment discrimination on the basis of age, race, and color with both the State of Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC"). The CHRO issued a release of jurisdiction on December 11, 2009, and the EEOC issued a right to sue notice on January 26, 2010. Mr. Richard initiated this suit thereafter, on February 12, 2010.

II.     **Discussion**[3]

To prevail on a claim of age or race discrimination under Title VII or the CFEPA,

a plaintiff must satisfy the three-step burden-shifting standard elaborated by the Supreme

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Collins v. Conn. Job*

*Corps*, 684 F. Supp. 2d 232, 249 (D. Conn. 2010) ("Claims of race . . . discrimination

under [Title VII and CFEPA] are governed by the *McDonnell Douglas* three-part burden-

---

[3] A court may grant a motion for judgment as a matter of law against a party "if [the] party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The legal standard for granting judgment as a matter of law "mirrors" the standard for summary judgment, such that "the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). Like a motion for summary judgment, "a motion for judgment as a matter of law [may be granted] only if [the court] 'can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (emphasis added) (quoting *Piesco v. Koch*, 12 F.3d 332, 342 (2d Cir. 1993)).

In considering a motion for judgment as a matter of law, a court should review "all the evidence in the record." *Reeves*, 530 U.S. at 150. However, not all of the evidence is treated equally; the court "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150–51. In other words, bearing in mind that "the jury is free to believe part and disbelieve part of any witness's testimony," *Zellner*, 494 F.3d at 371, the court should "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," *Reeves*, 530 U.S. at 151. Ultimately, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49.

shifting framework.”); *Asante-Addae v. Sodexo, Inc.*, No. 3:13-CV-00489 (VLB), 2015 WL 1471927, at *23 (D. Conn. Mar. 31, 2015) (“While courts also analyze age discrimination claims brought pursuant to the CFEPA under *McDonnell Douglas*, to rebut an employer’s proffered non-discriminatory explanation under CFEPA a plaintiff need only show that her age was a ‘contributing or motivating factor’ in bringing about the adverse employment action, as opposed to the but-for cause.”); *Tremalio v. Demand Shoes, LLC*, No. 3:12-CV-00357 (VLB), 2013 WL 5445258, at *21 (D. Conn. Sept. 30, 2013) (“[U]nder CFEPA, once the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must only come forward with evidence that age discrimination was a contributing or motivating factor in his termination and does not have to demonstrate that his age was the ‘but-for’ cause of the adverse action.”)

Under that standard, the plaintiff must initially “prov[e] by the preponderance of evidence a prima facie case of discrimination.” *Tex. Dep’t of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff makes this showing, “the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee’s rejection.” *Id.* at 253. “[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.” *Id.* Regardless of the burden shifting, however, “the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.” *Id.*

### A.  Prima Facie Case

"A plaintiff's burden of establishing a prima facie case is not an 'onerous' one." *Murray v. Town of Stratford*, 996 F. Supp. 2d 90, 106 (D. Conn. 2014) (citing *Burdine*, 450 U.S. at 253–56). Indeed, the Second Circuit has described it as "*de minimis.*" *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998). A plaintiff can meet his burden by demonstrating that: (1) he is a member of a protected class; (2) he applied and was qualified for the position; (3) he was subject to an adverse employment decision; and (4) the decision occurred under circumstances giving rise to an inference of discrimination. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citing *McDonnell Douglas*, 411 U.S. at 802). "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

There is no dispute that Plaintiff has met this burden. (*See* Def.'s Mem. Supp. Renewal Mot. for J. [Doc. # 81-1] at 12 (beginning the analysis with establishing legitimate, non-discriminatory reasons for not hiring Plaintiff).) Indeed, Defendant admitted as much before trial when it stipulated that: "[t]he plaintiff's race is African American, and his color is black"; "[t]he plaintiff's date of birth is August 3, 1947"; "Mr. Richard filed an application for the Process Control Manager"; "plaintiff had minimum eligibility qualifications" for the position of Process Control Manager; "[t]he defendant did not hire the plaintiff to the position of Process Control Manager"; "[t]he defendant hired Dwayne Lockwood for the position of Process Control Manager"; "Mr. Lockwood was younger than the plaintiff"; and "Dwayne Lockwood is Caucasion." (Stipulation of

Uncontroverted Facts.) *See Clarke v. 1 Emerson Drive N. Operations, LLC*, No. 3:13-CV-690 (JCH), 2015 WL 3453388, at *3 (D. Conn. May 28, 2015) ("This evidence—that [the plaintiff], a black woman, was replaced by a woman who is not black—is sufficient to meet [the plaintiff's] minimal burden . . . with respect to her prima facie case of race discrimination."). Accordingly, Plaintiff has satisfied step one of the *McDonnell Douglas* analysis, and the burden shifts to Defendant.

### B. Production of Legitimate, Nondiscriminatory Reasons

To satisfy its burden at step two, a defendant must "produc[e] evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotation marks omitted). The defendant need not persuade the factfinder that it was actually motivated by the proffered reasons; "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254; *see also Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).

Defendant easily satisfied that burden here by producing evidence that: (1) Mr. Lockwood was more familiar than Mr. Richard with both the Grass Island facility and the type of plant at which the Process Control Manager would work[4]; (2) Mr. Lockwood had

---

[4] (*See* Siebert Test. Feb. 27, 2015 at 48 ("We selected Mr. Lockwood because . . . he had been at the plant for many, many years. He has an excellent handle on how to operate the plant, which is . . . very, very important since we need to meet our permit. . . . And he knew how to do that. Every plant has its own personality. Operators that work at plants for many years get to know a plant . . .—how it works, how to tweak it in different weather conditions, whether it's rain or cold or summer. When various things may go a little bit wrong, they are familiar with the equipment, familiar with the process. He was

already demonstrated an ability to serve as the Process Control Manager for the Plant;[5] and (3) based on their respective interview performances and the fact that Mr. Lockwood had already developed relationships with members of the Grass Island team, Mr. Lockwood was more likely to be an effective leader at the Plant than was Mr. Richard.[6]

---

familiar with the instrumentation and controls throughout that plant."); *id.* at 87 ("Dwayne Lockwood was very familiar with our plant and does a good job operating it."); *id.* at 88 ("He knows how to operate the plant. One of the things you find . . . with treatment plants, with the staff that have been working in them for a long time, is they know how to run the plant. They may not know the exact technical explanation, or the formula for why something works the way it does. But they know how to make the adjustments that make the plant run most efficiently. So they know their plant, and believe it or not, they know them by smell, they know them by sound, they know them by sight. So they know how to adjust plant equipment, when, if things are starting to go a little bit awry, even if they may not be able to say to you the exact technical reason why that's happening.").) Mr. Feminella similarly testified to the importance of Lockwood's prior experiences at the Plant: "he understood . . . the way that our particular wastewater treatment plant operated, he was familiar with all of the staff, familiar with all the little subtle nuances of the wastewater treatment plant." Ms. Brown, testified to the same effect: "[Mr. Lockwood] had specific experience to Greenwich, which is very important."

[5] (*See* Siebert Test. Feb. 27, 2015 at 54 ("[Mr. Lockwood] was doing a very good job [as Interim Process Control Manager]. The plant was meeting permit. We were not having labor issues while he was running the plant, which is also, again, a positive thing. He was able to keep the team motivated and moving forward so that we could meet our permit."); *id.* at 50 ("[Mr. Lockwood was] able to give us some very good answers [during his interview] and ideas about what he would do if he was a process control manager" because "he already was working at the plant.").) Mr. Feminella similarly testified: "[Mr. Lockwood's] performance was very good based on the actual data that we would receive on a regular basis."

[6] (*See* Siebert Test. Feb. 27, 2015 at 49–50 ("Dwayne was well respected, and still is well respected by the rest of the staff there, and had very good rapport with them. He's able to manage them well. And he was showing us that, in addition – during his – we'd seen him perform, and we saw it during his interim activities with us. We've seen it over the years. He's always been an ambassador for our plant. . . . He's got a great relationship with people at DEP."); *id.* at 49 ("[Mr. Lockwood's interview performance] was very

Defendant's proffered reasons are more than adequate to meet its burden of production at step two.

### C.  Pretext

Because Defendant articulated legitimate, nondiscriminatory reasons for Mr. Richard's non-selection, "the presumption raised by the prima facie case [wa]s rebutted and drops from the case," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotation marks omitted), and the "sole remaining issue was discrimination *vel non*," *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). A plaintiff "may meet this burden 'either directly by persuading the [jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Cooper v. Conn. Pub.*

---

good. He was interested, very animated, good eye contact, again, good—exhibiting good presentation skills. You know, talked a lot in his answers about the people, motivating the folks in the plant, how he works with the folks in the plant.") *id.* at 54–55 ("[O]ur plant operates with two shifts a day, and seven days a week. So it's important that all the staff that are there at the plan, are . . . working together in harmony. Morale is very important. And Dwayne has been very good about keeping that. As we said, he's well respected by his peers, he was doing a good job while he was interim Process Control Manager, at keeping people working together as a team. He had done very well at that as an Operator Two, working with the maintenance team, working with his fellow operators.").) Mr. Feminella likewise stated: "[Mr. Lockwood] was very engaging, he was enthusiastic, he made eye contact, presented himself well. . . . He had [also] conducted a certain number of plant tours for different members of the public, as well as our approving boards. He'd interacted well with different town officials and various boards that we have. He also had a good working relationship with the regulatory agencies, such as Connecticut Department of Energy and Environmental Protection. . . . It's important for the Process Control Manager to have a good working relationship with the staff because it really is a team effort in order for the facility to operate properly. And if they either lose faith in, or have a real issue with the Process Control Manager, it can really impact, not only morale, but even the way that the treatment plant operates."

*Defender's Office*, 480 F. Supp. 2d 536, 545 (D. Conn. 2007) (quoting *Burdine*, 450 U.S. at 256), *aff'd sub nom. Cooper v. Conn. Pub. Defender's Office*, 280 F. App'x 24 (2d Cir. 2008). Generally, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. However, judgment for the employer as a matter of law may still be appropriate "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*

Plaintiff here did not purport to "produce direct evidence of discriminatory bias." (Pl's Opp'n Mot. for J. [Doc. # 86] at 13.) Rather, he attempted to demonstrate that Defendant's proffered reasons for hiring Mr. Lockwood over Mr. Richard were pretextual on the basis of: (1) the superiority of Mr. Richard's qualifications; (2) Defendant's reliance on subjective criteria in selecting Mr. Lockwood; and (3) Defendant's reliance on criteria that were not stated in the job description.

### 1.  Plaintiff's Qualifications

A plaintiff can demonstrate pretext in a variety of ways, including "showing that she was in fact better qualified than the person chosen for the position." *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88 (1989), *superseded on other grounds by statute.* However, "[a] plaintiff seeking to prove that a discrepancy in qualifications supports an inference of pretext faces a formidable burden." *Johnson v. Connecticut Dep't*

*of Admin. Servs.*, 972 F. Supp. 2d 223, 253 (D. Conn. 2013) *aff'd*, 588 F. App'x 71 (2d Cir.

2015). The Second Circuit has explained:

> [w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the *plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.*

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (emphasis

added); *Barry v. New Britain Bd. of Educ.*, 300 F. App'x 113, 114 (2d Cir. 2008)

(paraphrasing same). "Where a 'reasonable employer would have found the plaintiff to be

significantly better qualified for the job, but this employer did not, the factfinder can

legitimately infer that the employer consciously selected a less-qualified candidate—

something that employers do not usually do, unless some other strong consideration,

such as discrimination, enters into the picture.'" *United States v. City of New York*, 713 F.

Supp. 2d 300, 319-20 (S.D.N.Y. 2010) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707

(D.C. Cir. 2007)).

However, "'[t]he law is well-established that federal courts hearing discrimination

claims do not sit as a super-personnel department to reexamine a firm's business

decisions about how to evaluate the relative merits of education and experience in filling

job positions.'" *Johnson*, 972 F. Supp. 2d at 253 (quoting *Newsom-Lang v. Warren Int'l,

Inc.*, 80 F. App'x 124, 126 (2d Cir. 2003)). Employers are "free to choose the person that

they honestly (even if erroneously) consider the better-qualified candidate without being

subjected to liability merely because the candidates are of a different age" or race. *Bunk v. Gen. Servs. Admin.*, 408 F. Supp. 2d 153, 159 (W.D.N.Y. 2006).

Plaintiff here presented evidence to the jury that he had been operating sewage treatment plants for over thirty-seven years, in the capacity of superintendent, chief operator, crew leader, and plant shift supervisor. (*See* Richard Appl. at 4–5, 7.) In those positions, he supervised from 14 to 75 employees at any given time. (*Id.* at 4–5.) He had obtained an Associate's of Science degree in general studies from Manchester College, and had received technical school training in waste water treatment, water treatment, waste processing specialist supervision, demineralization, voluntary compliance, trenching and excavation, sewage plant operation, electrical safety, personnel management, electricity I and II, electronics I and semi-conductors lab, and data processing technology (basic programming). (*Id.* at 4, 7, 10, 11, 13, 15, 16, 18, 23, 24, 26, 28, 29.) In addition, he held a waste water class IV certification. (*Id.* at 4, 7, 9.) Based upon HR's review of his application, HR ranked him higher than any of the other candidates, scoring him at 83%, as compared to Mr. Lockwood's 70%. (*See* Eligibility List.)

On the other hand, Mr. Richard did not have any experience operating the type of plant the Process Control Manager would be asked to operate—that is, one utilizing a biological nutrient removal ("BNR") process. Ms. Siebert described that process as "a critical aspect of [the] plant" because it is "critical for [the plant to] achiev[e] [its] permit." (Siebert Test. Feb. 27, 2015 at 47.) The process "removes nitrogen, as well as other contaminants from [the plant's] wastewater," and is "a lot of the heart and soul of [the plant's] operation, for meeting [the] permit limits." (*Id.*) Mr. Richard had never operated

a BNR plant, and both Mr. Feminella and Ms. Siebert testified that when Mr. Richard described the BNR process to them, he described it backwards.

When Mr. Lockwood applied for the Position, he had been serving as the Interim Process Control Manager for about nine months and had worked at the Grass Island plant for twenty years. (*See* Lockwood Appl. at 4.) Mr. Lockwood began at the plant in 1988 as a utility worker, then moved up to shift operator, a supervisory position, in 1997, and finally in January 2008, he was promoted to Interim Process Control Manager. (*Id.*) In the time that Mr. Lockwood served as Interim Process Control Manager, the plant received $167,535 in nitrogen credit because its nitrogen level was below the permit limit for that year, leading Mr. Feminella to comment that Mr. Lockwood "had demonstrated that he had the ability to manage the facility, to meet those goals and objectives, and meet the permit limits that are required." Perhaps due to his experience as Interim Process Control Manager, according to Ms. Brown, Mr. Lockwood's "explanation of the biological nitrogen removal process and his understanding of BNR was better than any of the other two candidates."

Although Mr. Lockwood had obtained neither his Bachelor's nor his Associate's degree, he had earned a number of credits and certificates at various universities and technical training institutes. His coursework covered a range of topics, including: biological nutrient removal process control, WWTP operators forum, sampling and lab procedures for WWTP operators, small wastewater system operation and maintenance Vol. I, process control for activated sludge with applied math, treatment of metal waste streams, industrial waste treatment Vol. II, utility management, wastewater collection systems operator Grade II, basic electricity, biological nutrient removal workshop,

industrial waste treatment Vol. I, collection systems 1 & 2, collection systems 3 & 4, wastewater math, operation and maintenance of wastewater collection systems – Vol. I & II, wastewater chemistry, and operations of wastewater treatment plants Vol. I & II. (*Id.* at 7.) In addition, Mr. Lockwood had earned a class IV wastewater operator's license. (*Id.* at 10.) Ms. Siebert did note, however, that in his interview, Mr. Lockwood exhibited weaknesses in the areas of "process," "maintenance," and capital improvement planning. (Siebert Notes re Lockwood at 1.)

Plaintiff maintains that in light of his greater level of experience at sewage treatment plants, his superior educational background, his higher HR ranking, and his greater experience working in supervisory and management positions, a reasonable jury could have found that the employer's proffered explanations for hiring Mr. Lockwood over Mr. Richard were pretextual. (Pl.'s Opp'n at 15–17.) The Court disagrees. While Mr. Richard was a highly qualified candidate in some respects, so too was Mr. Lockwood, and each candidate had his weaknesses. It is true that Mr. Richard had an Associate's degree and Mr. Lockwood did not, but Mr. Lockwood had taken more additional credits than had Mr. Richard. Likewise, while Mr. Richard did have more experience working in a supervisory capacity and had worked at wastewater plants longer than Mr. Lockwood, Mr. Lockwood had a great deal of experience working at the Grass Island facility in particular, a proven track record of serving as Process Control Manager, and he was more knowledgeable about BNR processes than was Mr. Richard. Finally, while Mr. Richard scored higher in the initial HR assessment, all of the interviewers agreed that Mr. Lockwood performed better at the interview.

In light of the evidence before the jury, no reasonable jury could have concluded that Mr. Richard's credential were "so superior to the credentials" of Mr. Lockwood that "no reasonable [employer], in the exercise of impartial judgment, could have chosen" Mr. Lockwood over Mr. Richard for the Position. *Byrnie,* 243 F.3d at 103. "Rather, according Plaintiff all favorable inferences possible, the most that [could] be inferred from the record evidence [wa]s that notwithstanding the . . . applicants' different constellations of strengths, they were similarly qualified." *Pippin v. Town of Vernon*, 660 F. Supp. 2d 354, 366 (D. Conn. 2009). "Thus, the record evidence, taken in the light most favorable to Plaintiff, supports, *at best,* a conclusion that at the time it determined to hire Mr. [Lockwood], the Town was choosing from among [several] applicants, none of whose applications reflected qualifications far stronger than the others." *Id.* "In this circumstance 'the court must respect the employer's unfettered discretion to choose among qualified candidates.'" *Id.* (quoting *Byrnie,* 243 F.3d at 103). The difference in Mr. Richard's and Mr. Lockwood's qualifications do not suffice to demonstrate pretext.

### 2.   Subjective vs. Objective Criteria

Plaintiff also attempted to demonstrate pretext by comparing his "objective" qualifications with Mr. Lockwood's and arguing that his objective strength in "career, accomplishments, awards, and experiences far outweigh the purely subjective comments of Siebert that the [P]laintiff 'lacks presentation skills.'" (Pl.'s Opp'n at 24.)

Although "[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview, . . . an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion" or hiring. *Byrnie*, 243 F.3d at

104 (internal quotation marks omitted). "This is because any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." *Id.* at 104–05 (internal quotation marks and brackets omitted). Nonetheless, "[w]here an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn." *Id.* at 105 (internal quotation marks and alterations omitted).

Plaintiff here alleges that Defendant's selection of Mr. Lockwood was "not based on any objective criteria." (Pl's Opp'n at 16; *id.* at 22 ("The selection was based on subjective criteria. . . .").) No reasonable jury could have found this to be true. Although the interviewers did rely on some subjective criteria—namely, the candidates' interview performance—they also relied on a number of objective criteria. Mr. Lockwood's performance as the Interim Process Control Manager, for example, had been objectively good. As Mr. Feminella testified, and as demonstrated by the 2008 permit invoice for the Grass Island plant (Defendant's Trial Exhibit 513), during Mr. Lockwood's tenure as Interim Process Control Manager, the plant discharged an average of 479 pounds per day of nitrogen, well below the permit limit of 581 pounds per day, entitling the plant to $167,535 in nitrogen credit. Mr. Lockwood was, moreover, objectively more familiar with the Grass Island plant and staff, having worked there for twenty years, than was Mr. Richard, who had never worked there. Mr. Lockwood's experience and educational credentials speak for themselves; no subjective criteria is necessary to evaluate them. Finally, Mr. Lockwood was objectively more knowledgeable about the workings of a BNR

plant than was Mr. Richard, who had never worked at one, and who, according to both Mr. Feminella and Ms. Siebert, explained the BNR process backwards during his interview. In light of the clearly articulated objective criteria employed by Defendant, no reasonable jury could have found the employer's use of some subjective criteria to be a pretext for discrimination.

### 3. Unstated Requirements

Plaintiff's final argument is that Defendant's "use of previously unstated criteria"—specifically, "work experience at a 'BNR' plant and familiarity with the Grass Island treatment plant"—"with full knowledge that [the addition of such criteria] would foist Lockwood over the plaintiff, after the plaintiff had been rated above Lockwood, supports an inference of discrimination." (Pl.'s Opp'n at 10, 11.)

Despite Plaintiff's emphasis on his HR-assigned score, the uncontradicted evidence and testimony at trial was that the HR scores were based solely on HR's "initial review" (Siebert Test. Feb. 27, 2015 at 37–38) of each candidate's education, work experience, licenses, and IT proficiency (*see* Joint Trial Ex. D), and did not take into account the remaining criteria[7] listed in the job description (*see* Job Description at 4–5). After HR determined which candidates were eligible for the available position, the applications were forwarded to the department head, who was permitted to select any candidate from the eligibility list compiled by HR. (*See* HR Policy & Procedure, Def.'s

---

[7] Remaining selection criteria include, *inter alia*, "[s]kill[s] in oral and written communications and group presentations," "ability to establish and maintain effective and cooperative working relationships with superiors, subordinates, associates, officials of other agencies and the general public," ability to "direct[] the training of operating personnel, resolve personal problems, grievances and issues at intermediate level." (*See* Job Description at 4–5.)

Trial Ex. 506 at 1 ("Department heads and appointing authorities may employ any full-time candidate from the applicable eligibility list certified by the director of Human Resources."); Personnel Policy Manual, Def.'s Trial Ex. 507 at 1 ("The department head who initiated the requisition will make the final decision to hire or not to hire qualified candidates from eligibility lists. . . ."); Siebert Test. Feb. 27, 2015 at 41 ("[W]hen we get these eligibility lists, we are indeed allowed to select anyone off the list. It's our job to go through the applications, to look and see what is in the applications, to determine who we're going to bring in and interview, and then make our selection from that.").)

Moreover, at least one of the skills Plaintiff terms "previously unstated criteria"—work experience at a BNR plant—was implicit in the job description, even if not specifically stated. The job description stated in part that the Process Control Manager would be "[r]esponsible for directing the process control activities of large wastewater treatment plant and related treatment facilities." (Job Description at 4.) As Mr. Feminella testified, where the wastewater plant in question is a BNR plant, it is implicit that directing the process control activities includes directing the biological nutrient removal process. Indeed, there was ample testimony about the importance of the Process Control Manager understanding the BNR process in order to ensure the plant met its permit. (*See, e.g.*, Siebert Test. Feb. 27, 2015 at 47 ("[The BNR process is] a critical aspect of our plant. . . . It's critical for us achieving our permit.").)

Given the importance of understanding the BNR process and the differences between different types of plants highlighted by all of the interviewers,[8] it was not

---

[8] (*See, e.g.*, Siebert Test. Mar. 6, 2015, Ex. 2 to Def.'s Renewal Mot. for J. [Doc. # 81-3] at 30 ("[T]he plant has a lot of moving parts and a lot of equipment and systems

unreasonable for Defendant to consider Mr. Lockwood's experience at the Grass Island plant as one factor in their considerations. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1297 n.15 (D.C. Cir. 1998) (en banc) ("[R]easonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job."); *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006) ("[E]mployers are not rigidly bound by the language in a job description."). Although in some cases, an employer's emphasis on criteria not stated in a job description might offer proof of pretext, in this case, no reasonable jury could have concluded, based on the evidence before it, that Defendant's emphasis on Mr. Lockwood's experience with BNR processes and his experience at the plant was pretext for discrimination.

_____

that, as they get upgraded, again, that hands-on experience can be extremely helpful to the actual engineers who were doing the deigns of the process.").) Ms. Brown likewise testified: "In wastewater treatment, you could have one plant that's designed identically to another plant in different communities. And because of the wastewater characteristics, they're going to operate very differently. . . . So, in my mind, and whenever I evaluate candidates, I look for experience specifically at that treatment plant. Because to me, that has a much greater importance than other things." Mr. Feminella added: "[N]ot every wastewater treatment plant operates or behaves exactly the same. . . ."

21

### III.    Conclusion

Because there was not sufficient evidence for a reasonable jury to find that Defendant's decision to hire Mr. Lockwood over Mr. Richard was motivated by either racial or age discrimination, Defendant's Motion [Doc. # 81] for Judgment as a Matter of Law is GRANTED. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 7th day of December, 2015.